Thank you. May it please the Court. This is an appeal from a summary judgment, and it's Biovail's position that there were both claim construction errors and issues of material fact that should have precluded entry of summary judgment. I am going to first address the fact issues because I believe that they best focus the claim construction issues. So that even if you assume that the district court's claim construction, as it applied it, in granting summary judgment was correct, you are still left with this fundamental fact question. Is there any hydrochloric acid in the tablet that Anchen is likely to mark up under the ANDA? Anchen's experts said, well, if there's any water left, there's also hydrochloric acid, but in trace amounts only. No one said, no one opined that there was anything more than that. But on the other hand, so that's a claim construction issue as to whether trace amounts stabilize or are sufficient. That is the claim construction issue that I will get to. But what I want to emphasize now is nothing in the ANDA requires that there be any water in the tablet that Anchen is likely to mark up. Now, they pointed to water or the possibility of water left at a point in the process. I would point out to your honors that that's a claim construction issue also. The question is whether there has to be a need for a stable answer here or whether just the presence of hydrochloric acid in and of itself, whether it's needed or not, is sufficient to make it not free of stabilizing. I mean, it doesn't seem to me that there's really that much of a factual dispute between the parties as to what's going on here. You seem to agree that if leftover hydrochloric acid from the process is present there, it was identified in the ANDA. And if it has to have a functionality, it wasn't sufficiently described in the ANDA. Well, let me address that just a second. Because the ANDA doesn't specify any hydrochloric acid in the tablet, only in the processing of the tablet. So the ANDA doesn't say there's any hydrochloric acid left. In fact, the ANDA implies the opposite, that 100.00% of the components in the tablet do not include any hydrochloric acid. And the ANDA also says... It has a dash instead of a zero. What? It has a dash instead of a zero, right? No, it does not. It says 100.00%. But in terms of where are you, in the places where it does list hydrochloric acid, it has a dash, right? But that's only in the process. Not in the tablet, there is none. See, Judge Selma went awry. The defining difference... It wouldn't have to be listed in the tablet unless it had a functionality, would it? If it had any functionality at all, it would have to be listed in a mile. Right, but if it didn't have a functionality, it wouldn't have to be listed. Then it wouldn't be a stabilizer. Well, that's the question. That seems to me it's a time construction issue rather than an issue as to what the ANDA discloses. I'm not disagreeing with your proposition, Judge. I'm only pointing out that in addition to the claim construction issues, there were also fact issues. Because the defining difference between Judge Selma's tentative judgment denying summary judgment on the basis of a plethora of fact issues, the defining difference between that and his final decision was his reliance on the so-called draft guidance, which he totally should have ignored, but he didn't. He should have ignored it because, number one, it didn't represent any thinking of the FDA because it had never been finalized. And secondly, he totally misread what was in the guidance. He thought that the dashes mean... He thought that the dashes don't mean zero, but if you look at the pages of the guidance that he cited, it doesn't say that. He thought that removed during processing meant there's some amount left over, but the guidance doesn't say that either. I don't think there's really a difference between you as to when you get to the end of the day as to what the ANDA discloses. You say the ANDA doesn't disclose a stabilizer which functions in the tablet, and I'm not sure they disagree with that. And you agree that the ANDA is consistent, at least, with the view that leftover stabilizer from the process can be present in the tablet as long as it doesn't perform a function. Well, I agree that it doesn't perform a function because the pH tests that Ann Chen submitted, which they compared the ANDA tablet with a similar tablet prepared without the preparation of any hydrochloric acid, showed statistically insignificant differences, which indicates, and I believe this is a fact issue, that therefore that shows that there is no hydrochloric acid left in the ANDA tablet. I think it's a claim construction issue. Well, I'm agreeing with that, and let me turn to the claim construction issue because... Mr. West, we know that a lot of things today are called claim construction, which really are infringement. But let me, before you change the topic, is there any dispute about whether there is any excess HCl in their product? Absolutely. Absolutely there is, because there is nothing that shows that there is any water, even if you believe they're experts, that if there's water in the hydrochloric acid, there is no evidence that there is any water left in the tablet. That's a question about the water. The question was, is it agreed that there is leftover hydrochloric acid in the tablet? No. There's not agreement. Absolutely no agreement. But your position, referring to the ANDA documents, is that they have represented that there are no additional components to it. Do I understand that argument? Yes, that is our argument. That is definitely our argument. Do they dispute that? I think they dispute that, but we think the weight of the evidence, as shown by the ANDA and by their own pH tests, show the contrary, that there is no hydrochloric acid left in the ANDA tablets. With that, I will turn to the claim construction issues, because I think that Judge Selma's primary error there was that he failed to focus the claim construction inquiry on what the claim term free of stabilizer would mean to those of ordinary skill in the art. Along that line, can you help me with this sentence and specification, which I really have a hard time understanding? It's in column one, and it's on line 24. It says, matrix technology is, however, not suited for the manufacture of tablets, since it implies the use of stabilizers. Yes, I can try to explain that. As I understand it, matrix technology was a technology in which, I'm not going to be able to describe this perfectly, but I can tell you what the primary difference between matrix technology and the technology of the patent and the Nanshan's product are. The difference is that in the matrix technology, the tablet was more permeable to water, whereas in the tablet of the patent and the Nanshan's product, there is a coating, which makes the interior of the tablet less accessible by water. So in the matrix technology, you need a stabilizer because the water might get into the tablet. Exactly. But this sentence is still obscure, because I thought matrix technology was used to make tablets. It was used to make a tablet, correct, but it was a tablet in which water could get in more readily, and consequently, a stabilizer was required. So it's a confusing sentence. I would submit that it's not confusing to those skilled in the art who are familiar with it. And they would be familiar with it, but Judge Selma decided he didn't need to consider that because he thought the term was readily apparent to himself. What's the disadvantage? The record shows a disadvantage to having a stabilizer in the tablet. I understand that the disadvantage is that it's generally undesirable to work with strong acids like hydrochloric acid in processes. So if you could avoid that, if you could avoid using that in the processing, and if you didn't have to add a stabilizer to the tablet, yes, there would be advantages to that. You'd have fewer components that you'd have to put into the tablet. So there would be advantages. Does the record disclose that, or is that just your opinion? I don't think it does expressly, but I think that's what I would assume. I think that's what anybody would assume. So they drafted a claim which said free a stabilizer. They identified hydrochloric acid as the most common stabilizer as part of its enzyme, right? No, they didn't identify it in the 3-4-1 tablet. Hydrochloric acid is not mentioned in the 3-4-1 tablet. But this crystine hydrochloride? Cysteine, yes. That's another acid. That's a different acid. There are different components of that as hydrochloric acid. No. No? No, it's just a different acid. It's a different acid. Yes. But what I want to stress here is that this court and Phillips and many other cases have repeatedly emphasized that you have to consider claim construction and what the term would mean to those skilled in the art. Judge Selman didn't do that. And, in fact, he ruled out the most important part of the specification, which was the citation of the 970 patent, which read in conjunction with the rest of the specification would have told those skilled in the art that a stabilizer is something that is in an effective amount to be capable of stabilizing. I don't understand that. Because those earlier patents don't define a stabilizer as an effective amount. They require an effective amount of stabilizers. No, what this 970 patent says is that a stabilizer is something that inhibits or prevents degradation of the product. And that means it has to be there in a sufficient amount to prevent, not tend to prevent, but to prevent or inhibit. The language of the 970 acts as a pharmaceutically acceptable stabilizer in an effective stabilizing amount. I don't see that as a definition of stabilizer as being an effective amount. In fact, all I can say is that one skilled in the art reading this would always know that a stabilizer would never be simply a trace amount of anything. It would have to be something in a sufficient amount to provide whatever is needed to stabilize. And in this case, what it would have to provide is excess protons. There would have to be a lot of protons in there that would be capable of stabilizing. It's a truism. If it's going to be effective, a stabilizer has to be an effective amount. The definition of the word stabilizer does not include an effective amount. Well, I would say yes, but I agree with your truism. A stabilizer is, to be a stabilizer, it's always going to be an effective amount. No, to be an effective stabilizer, it has to be an effective amount. Well, no, I disagree with that. But I'll reserve the rest of my time for rebuttal. Thank you. Thank you, Mr. West. Mr. West. May it please the Court. I would like to take an issue with, I think, an issue that judges brought up with Biavel, which was the fact question about whether or not there is a factual dispute about whether any hydrochloric acid remains in Antgen's product. And I think the answer that Biavel gave was that there was a factual dispute about that. And I can say that if there is anything that is completely clear in this case, it is that everyone agrees that there is residual, there is hydrochloric acid in our tablet. But in your filings for the Antgen, doesn't it say no hydrochloric acid? Absolutely not, Your Honor. Our filings, well, first of all, as far as our filings with the FDA, we're required to make certain, provide certain information about our product to the FDA. We describe to the FDA how we make our product in rapid detail. We tell them everything we put into our product. We tell them how we process it. And we tell them what specifications we have for the finished product. And nowhere do we say that there is no hydrochloric acid in our product. What we do say is that there is 0.07 percent moisture remaining in the product. When you do the Bosson drying test, it's 0.7, I believe. And that tells you, everyone admits that that tells you that there is hydrochloric acid in the product. But it's not identified as being in the product. I mean, this is very strange, it seems to me. The stabilizer, when you say you have a stabilizer, you're talking about hydrochloric acid. Is that right? No other stabilizer? Well, there are other things we believe that stabilize a tablet, but hydrochloric acid is one of the stabilizers in the stabilizer. I'm talking about that you have Neanderthal in the product, which is charged with infringement. We describe the purpose, and we say it's a stabilizing agent, is what we say in our handout for hydrochloric acid. We tell the FDA that. I just want to be sure that I understand your position in Neanderthal, in the representation which brought all of this to come to pass. Is that there is or is not excess hydrochloric acid? The FDA, what we told the FDA was that we put all this hydrochloric acid into our product when we make it. And we describe the process that we make the product. We do not tell the FDA anything specific about how much of that hydrochloric acid that we describe of putting into the product remains at the end of the day. We say nothing. We say that the hydrochloric acid, the dilute hydrochloric acid has evaporated during processing, which, by weight, it has. And that is the convention. It's evaporated. How can it be there? Well, because everybody recognizes, and all of the biovials experts, Dr. Drusey, Dr. Fleischer, recognize that that is the convention that you use for describing volatiles that are placed into the product during processing. It's not the same as dry weight of API. And you take all those tables about the percentages. Those are a targeted percentage based upon a very simple formula that Dr. Williams and everybody says is you take the dry ingredients that go into your product, you divide it over the number of tablets in your product, and divide that by how much of the weight of each tablet, and you come up with a theoretical view. But let's get back to the representation, which started all of this going, was that there was no hydrochloric acid, no free hydrochloric acid in the product. And just looking at it, it's not mentioned. And my understanding is that there is an obligation. If your product differs from the product whose federal registration you're adopting or adapting to, isn't there an obligation to set forth that difference? Absolutely not, Your Honor. There isn't a problem here. And on both sides, it seems to me like to be somewhat unclear about this, that under the FDA rules, if it has a functionality in the product, it has to be listed. It's not listed. Therefore, there are not functional amounts of hydrochloric acid in the tablet. I don't agree with that. You don't agree with that. But it seems to me that, on the other hand, that there is, and it is consistent with the idea, that there are at least trace amounts of hydrochloric acid left from the processing in the tablet. But what's your basis for saying that you can avoid listing it if it has a functionality? Well, the FDA, we list it in the page of the ANDA that requires us to list our ingredients. We list hydrochloric acid. And that's what the FDA's requirement is. It's the only stuff that goes into the process, right? That's the only place where they require you to list the ingredients. Well, if it has a functionality, you've got to list it in this product or tablet, right? There is a huge debate about whether or not the functionality, if it's an API, the CFR requirements regarding these applications say that they divide these into two functions. They say it's either inactive or an active ingredient. Active ingredients, there are certain requirements for what you have to prove with regard to your ANDA. Inactive ingredients, the CFR says that they only use it for safety and effectiveness. And the FDA has a great wealth of experience with regards to the use of hydrochloric acid in products like this. The original Wellbutrin product used hydrochloric acid as a stabilizer. So they have a wealth of experience with regard to dealing with hydrochloric acid. And they know what hydrochloric acid does and how it acts when it's introduced into this process. It's listed as one of the components. It's listed as a component, but there is no requirement that we try to make a targeted projection. You said it's listed as a component of the process. I was talking about the product. There is no separate requirement that requires hydrochloric acid to be distinguished in that respect. Let me try to approach it this way. If you don't agree that there's no functionality, what is the functionality of the leftover hydrochloric acid in the tablet after the process is completed? We have introduced evidence and the record is clear that hydrochloric acid in the tablet that remains there functions and stabilizes the tablet, improves the stability of the tablet. So the hydrochloric acid that remains in the tablet is still acting as a stabilizer after the tablet is completely manufactured? Yes, definitely. That's laid out in the prior art. Let me try to understand. This is where I want to keep interrupting you, but I know you're circling the question. If it's functioning as a stabilizer, doesn't it have to be listed as a component? The FDA says no, Your Honor. The FDA gave us... You're saying it has no function, and therefore it doesn't have to be listed? No. The function that it provides is improvement of the stability of the product. The FDA requires us to have stability tests and to provide stability data for our product. We do that. The FDA requires us to have a specification for LOD. We have that specification. Loss on drying. It says that no more than 1% of our product will be lost on drying, which is a representation of how much water is in the product. Where do you find in the record evidence that the FDA doesn't require it to be listed as a component of the tablet if it functions as a stabilizer? Well, the evidence in the record would be the admissions from BioVale's FDA experts and our FDA experts, who all agree that we comply with the applicable FDA requirements. We're not required to prove infringement in the FDA. Answer my question. Where in the record does it say that you can avoid listing something which functions as a stabilizer? Which functions as a stabilizer, not trace amounts of stabilizer that don't have a function in the product or tablet? Well, with all due respect, Your Honor, I don't think that statutes are written in the negative or in the affirmative. They're written to tell you what you have to have in your tablet. They don't cite a single statute. When they mention this functionality argument, they don't reference any statute or any CFR provision to support their argument. It's a – it's – their experts said, we think they should. That's – they should. Do they require it? No. With different types of FDA? Required to rely on these FDA guidelines, this draft. And, you know, for the moment, accept the fact that the draft is an accurate reflection of what the FDA requires. Does the draft say that you don't have to list it if it functions as a stabilizer? The FDA – the draft guidance defines certain things that you don't have to list specifically. One of the things that they say are processing agents. And processing agents, they define in the guidance to say processing agents are things that remain in the product in amounts less than 1 percent. Okay, but that sounds to me like it's saying that you can have some leftover processing agent. You don't have to identify it as long as it doesn't have a functionality in the tablet. Well, no. It says what process – the FDA doesn't – hydrochloric acid is considered a safe and effective additive to products. It's found in the human body. It's found in your stomach. It's not something that the FDA looks at and says, you need to – we're concerned about – like hydrochloric acid, we're concerned about ethanol or other solvents that would be required. Your hydrochloric acid is pretty deadly, isn't it? Well, Your Honor, pure hydrochloric acid isn't added to our product. You're talking about the most concentrated form of hydrochloric acid that's possible in a liquid form that would be a 38 percent solution. The – this hydrochloric acid that we're adding to our product is far less – it's a – it's, I think, a 10 percent solution. Does the FDA know? They're saying that you could put in whatever it is, the hydrochloric acid, and not report it and they handle it? Oh, no. Our ANDA specifically says how much of dilute hydrochloric acid to the – to the decimal point of – to the gram of how much hydrochloric acid is added. It says in your process. You were talking about the process. Yes. Components, not the product. Well, I don't – there's no – the FDA has the information. It's different. And our position is, Your Honor, by the fact that our ANDA was then amended. You know, once they raised this kind of argument, we amended our ANDA and said, okay, we put in hydrochloric acid as an ingredient explicitly on the label. Are we happy? They said, no, we're still not happy. It's just an argument that they – and the FDA didn't require any further information. It's just – it's an affirmation that the way that the bio-build has characterized the legal framework for the FDA is wrong. As I understand, the district court did not discuss this argument that you changed your – your ANDA. Is that right? The district court didn't rely on it in – he rejected their view that it was a sham, but he said, I don't need to rely on the fact that you're amended for the purposes of what I'm deciding here. He just said, I don't want you to look at it. Because our – our ANDA amendments did not change at all any of the processing steps of our product. You keep talking about the processing steps. There's no doubt, I think, for both sides that hydrochloric acid is the component which is used to prepare the hydrochloric. But it is troublesome to see the representations in the ANDA that, again, after all this litigation was over, I don't know how to describe the proposed change. But I didn't see anything that said that there was excess hydrochloric acid in that product. The ANDA – If, in fact, you say your product is stabilized, that's the stabilizer you're talking about, right? That's one of the – that's one of the components we believe ensures the stability of the product. Are there stabilizers that are used to – Well, the evidence is that coatings can – certain coatings can also perform a stabilizing function, yes. Bival, for example, changed their formulation – Were there findings? Was that something that was presented, that some of these other components are serving as stabilizers? Yes, there was, Your Honor, yes. Is there any – there was no decision on that? No, the judge – I don't recall it being discussed in the briefs, is it? It's discussed in the briefs, yes, Your Honor. That what the district court heard in considering hydrochloric acid as a stabilizer? No, the point was free of stabilizer. The dispute that we had was regarding the hydrochloric acid. There's two claims. There's a claim that says claim 30, claim 1 and claim 30, whether there's a free – a tablet free of stabilizer or a core of the tablet free of stabilizer. So even if the coating necessarily – if that wouldn't address both claims, so the parties didn't focus on that in particular because it only would have addressed one of the claims. So they focused on the absence of stabilizer that – the presence of stabilizer in the core, which would take Antion's product outside of both of the claims that had been asserted. Counsel, let me make sure – I do want to make sure I understand. Your argument is that you disclose hydrochloric acid, do this to hydrochloric acid as part of the process to be a stabilizer. After it is processed and comes out in tablet form, you are left with some residue of hydrochloric acid, which continues to act as a stabilizer, but you don't have to disclose that as an ingredient. Is that correct? You don't have to disclose it as an ingredient any more than we did in our – in any way different than how we did in our handout. Yes, Your Honor. And I just – I mean, with regard to the fact issue about hydrochloric acid, once you put it in the product, it is – there's no dispute that you can't get it out. It's very difficult to get out. The – Mr. Court Judge found it at 80-15 of his decision. It's based upon some studies that he said were unrebutted, that once you put hydrochloric acid into the formula because of its properties, it will not go. And then also our batch records at 07, and then that Dr. Dribble at 83-46 admitted that there was – that he initially thought 100 percent of the hydrochloric – of the vials were – the water was driven from our product. And he admitted at 83-46 that he was wrong, that he made a mistake, and that there is water in our final product and that it contains hydrochloric acid. What is the benefit of having a panel that's free of stabilizers? Did the experts address that? What is the benefit of having – Yeah, is there a benefit to it? I – if we're not the patentee, I would say that there's a debate about that. They just claimed free of stabilizer. The patent – the claims of this patent did not claim that their product – that the tablet was stable in any sense, any 20-degree, or achieve any level of stability. The answer is that there's no expert testimony found for their intent as to being free of stabilizer. Well, there is some testimony and evidence that talks about the benefits of – or the problems of using hydrochloric acid or other acids as a stabilizer in processing, in that it's corrosive and it can be damaging to equipment that's used to make tablets. But there's no testimony about any benefits of the ultimate tablet being free from stabilizer. No, actually, the reverse is true. For example, Antgen's product has stabilizer in it, and it has a longer shelf life. FDA has approved it for a two-year, whereas the brand product has a less – lesser shelf life than Antgen's generic product. It's just hard for me to understand why you would write a patent that says free of stabilizer if having a stabilizer there isn't detrimental. But that's – you'd have to ask Dr. Seff to do that. Thank you, Your Honor. I want to return to the fact issues because there is a dispute about this amount of moisture left. I want to point out to you that this LOD of 0.67 is referring to the – excuse me, I've got the wrong volume – is referring to a process chart that is shown in the appendix at page 3628. Here's the process. Here's the hydrochloric acid. Here's the grime. Here's the moisture left at this point in the process, but before you get to the final product, you come through all of these other steps of processing. There are no measurements that show any moisture left in the final product. It's all up here in the intermediate product. So that's why I say there's a – I thought there was a lot of testimony that there was hydrochloric acid left in the product as a result of the process. All of the testimony was about this point in the process. You're not answering my question. Beg your pardon? You're not answering my question. I apologize. I thought the testimony was undisputed that as a result of using hydrochloric acid in processing, there are at least trace amounts of it in the tablet. If there's water left in the tablet, but what I'm pointing out is that there's no evidence that there's any water left in the final tablet. That's my point. Only in the intermediate, and that's what all of the testimony was about. Mr. Mazurk, as I heard him disagree with the question about whether functional amounts have to be listed, I agree that functional amounts do have to be listed. Hydrochloric acid is not listed as a functional ingredient, and therefore that is an indication and a representation that there is no hydrochloric acid performing any function as a stabilizer or any other function in the final product. If there are no further questions, I'll – I don't have a question. I do have a comment. This is to both sides. It strikes me in reading these briefs that there's a really improper amount of material that's labeled confidential. There's all sorts of stuff in here that can't possibly be confidential that's labeled confidential. Would you both go through the briefs and edit out, because a lot of what's labeled as confidential is in the district court's opinion and is broadly discussed, and it's – so would you both – I don't know which of you has marked the various things, but would you give us another, both of you, copy of the briefs with a really more realistic view of what's confidential? I would be happy to do that, Your Honor. I didn't have any part in either the briefs or preparing the appendix or in designating materials, but, yes, I will work with Mr. Breslin to do that. We will take care of that. Thank you very much.